# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *In re: UnitedHealth Group PBM Litigation* | Case No. 16-CV-3352 (JNE/BRT) |
| THIS ORDER RELATES TO: Nos. 16-CV-3352, 16-CV-3496, 16-CV-3914, 16-CV-3996, 16-CV-4119, 16-CV-4129, 16-CV-4130, and 16-CV-4136 | **ORDER** |

Plan members bring suit against UnitedHealth Group, Inc. and some of its wholly-owned subsidiaries[1] under the Employee Retirement Income Security Act of 1974 ("ERISA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and various state laws relating to breach of contract, fraud, and deceptive trade practices for Defendants' conduct in administrating pharmacy benefits that allegedly caused Plaintiffs to overpay for prescription drugs purchased at retail network pharmacies. (*See* Consolidated Class Action Compl. ("CAC"), Dkt. No. 52.) Defendants filed a motion to dismiss the CAC. (*See* Dkt. No. 67.) For the following reasons, the Court grants Defendants' motion to dismiss.

## I.   STANDARD OF REVIEW

Defendants move to dismiss Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6) and 9(b). (*See* Dkt. No. 67.) When ruling on a motion to dismiss under the rules, the Court accepts the alleged facts as true, drawing all reasonable inferences in favor of the non-moving party. *See Drobnak v. Andersen Corp.*, 561 F.3d 778, 781 (8th Cir. 2009). "This tenet does not apply, however, to legal conclusions or 'formulaic recitation of the elements of a cause of action'; such

---

[1]     Defendant UnitedHealth Group ("United") wholly owns, either directly or indirectly, the other Defendants in this action, which include UnitedHealthcare, Inc., United Healthcare Services, Inc., UnitedHealthcare Insurance Company, UnitedHealthcare of Alabama, Inc., Oxford Health Insurance, Inc., UnitedHealthcare Community Plan, Inc., Optum, Inc., and OptumRx, Inc. (*See* CAC ¶ 1; Dkt. No. 58.)

allegations may properly be set aside." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009); *see United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 955-56 (8th Cir. 2012).

Under Rule 12(b)(6), the Court evaluates whether the alleged facts are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court draws on "its judicial experience and common sense" to determine if the factual statements nudge a claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 679-80. When reviewing a complaint for compliance with Rule 9(b), the Court determines whether the plaintiff "state[s] with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

## II. BACKGROUND

Plaintiffs received prescription drug benefits through health plans purchased directly from Defendants or issued or administered by Defendants for Plaintiffs' employers. (CAC ¶ 2.) The non-Optum Defendants are health insurance and/or plan administrators (the "United insurers"), and Defendant OptumRx (a subsidiary of Optum) is a pharmacy benefit manager ("PBM"). (*Id.* ¶ 5.) The United insurers retained OptumRx as a PBM to provide prescription drug benefits to plan members. (*See id.*) OptumRx participated in curating drug formularies, setting copayment, coinsurance, and deductible requirements (member "contributions"), and providing plan members with access to a network of pharmacies that have contracted with OptumRx to adhere to certain terms, including accepting discounted rates for providing prescription drugs. (*See id.* ¶¶ 5, 64(c).)

Before filling a prescription, pharmacies within OptumRx's network of pharmacies transmit key information about a plan member and the prescription via interstate wires to

OptumRx, which "instantaneously processes the claim according to the prescription drug plan assigned to the patient." (*Id.* ¶ 58.) OptumRx then transmits a message back "indicating whether the drug and patient are covered and, if so, the amount the pharmacy must collect from the patient as a copayment or coinsurance, or to be paid toward a deductible." (*Id.*) Sometimes, a copayment amount is greater than the amount OptumRx otherwise agreed to pay the pharmacy, leading to a positive "spread." (*Id.* ¶¶ 60, 185.) The spread is the difference between the amount the pharmacy agreed to be paid and the amount it received from the plan member. (*See id.* ¶ 7.) The agreements between the network pharmacies and OptumRx require the pharmacies to remit the spread to OptumRx—what Plaintiffs term the "clawback." (*See id.* ¶¶ 61-62, 71.) The pharmacies are not entitled to keep the spread. (*See id.* ¶¶ 7-8.) In addition, the agreements between OptumRx and pharmacies require pharmacies to forebear from informing plan members if there is a spread and that it is remitted to OptumRx. (*See id.* ¶¶ 70, 82, 85-87, 92.)

Plaintiffs' plan documents outline what plan members must pay to receive prescription drugs under their plans. Under each of Plaintiffs' plans, the plan documents provide that plan members must pay copayments or coinsurance when filling prescriptions at retail pharmacies. (*See id.* ¶¶ 4.) Plaintiffs allege, however, that they were entitled to pay less than they were charged as copayments or coinsurance under the terms of their plans because their plans entitled Plaintiffs to receive the benefit of the discounted rate, in the form of lower copayments or coinsurance amounts. (*See id.* ¶ 181.) Plaintiffs allege that they purchased certain drugs on numerous occasions and were overcharged due to OptumRx's contribution calculations, resulting in spreads and clawbacks. (*See id.* ¶¶ 128-42, 318.) They bring claims for damages and equitable relief on behalf of two classes and five subclasses. (*See id.* ¶¶ 209-211.)

3

### III. ANALYSIS

**A.  Count I under ERISA § 502(a)(1)(B)**

Plaintiffs' first count, which is brought under ERISA § 502(a)(1)(B) by the ERISA Plaintiffs on behalf of themselves and the ERISA Subclass, is to recover benefits due to the ERISA Plaintiffs under the terms of their plans, to enforce their rights under the terms of their plans, and to clarify their rights to future benefits under the terms of their plans. (*See* CAC ¶ 233.)

*1.  Plan Terms*

Claims brought pursuant to this section stand or fall by the terms of the plan.[2] *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009). "When construing the language of an ERISA plan [courts] begin by examining the language of the plan documents. 'Each provision should be read consistently with the others and as part of an *integrated whole.*'" *Bond v. Cerner Corp.*, 309 F.3d 1064, 1067-68 (8th Cir. 2002) (citation omitted); *see Spizman v. BCBSM, Inc.*, 855 F.3d 924, 927 (8th Cir. 2017); *Kitterman v. Coventry Health Care of Iowa, Inc.*, 632 F.3d 445, 448 (8th Cir. 2011). "Further, the terms must be construed so as to render none of them nugatory and to avoid illusory promises." *Barker v. Ceridian Corp.*, 122 F.3d 628, 638 (8th Cir. 1997) (citation omitted). "If the plan is deemed ambiguous, extrinsic evidence may be considered. But any ambiguities should be construed against the drafter only as a last step." *Bond*, 309 F.3d at 1068 (citation omitted).

Defendants argue that Count I should be dismissed with respect to most of the ERISA Plaintiffs because the relevant plans do not entitle the ERISA Plaintiffs to the discounted rate.

---

[2]    The Court may consider plan documents relating to Plaintiffs' plans because they are necessarily embraced by the pleadings. *See* Fed. R. Civ. P. 12(d); *Morrison v. MoneyGram Int'l, Inc.*, 607 F. Supp. 2d 1033, 1045 (D. Minn. 2009) (citing *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003)).

(*See* Defendants' Memorandum in Support of Their Motion to Dismiss ("Def. Br.") 13-16, Dkt. No. 69.) They do not dispute that Ellington and Sohmer's (2016 only) plans entitle plan members to the discounted rate. (*See* Defendants' Reply Memorandum ("Def. Reply Br.") 3 n.3, Dkt. No. 106.) Plaintiffs respond that all Plaintiffs' plans prohibit the collection of spread and clawbacks. (*See* Plaintiffs' Response Memorandum in Opposition to the Motion to Dismiss ("Pl. Br.") 5-9, 12-13, Dkt. No. 97.)

Starting with the alphabetically-first ERISA Plaintiff, Ackerman, the Court finds that his plan does not entitle him to any discounted rates. The "Outpatient Prescription Drug Rider" to Ackerman's plan states that he is responsible for paying the lower of: (1) "the applicable Out-of-Pocket Expense," or (2) "the Network Pharmacy's Usual and Customary Charge." (Dkt. No. 80 at 157.) The Rider explains that "Out-of-Pocket Expenses" are those outlined in the "Summary of Benefits" and are "either a specific dollar amount or a percentage of the Prescription Drug Cost." (*Id.*) The Summary of Benefits for Ackerman's plan lists different flat copayment amounts for different tiers of drugs. (*See id.* at 16.) The Rider defines "Usual and Customary Charge" as "the usual fee that a pharmacy charges individuals for a Prescription Drug Product without reference to reimbursement to the pharmacy by third parties." (*Id.* at 162.)

Plaintiffs argue that a "UCR Rider" defines the "Usual, Customary and Reasonable (UCR) Charge" as the lesser of several things, including "the amount the provider agrees to accept as reimbursement for the particular covered services, supplies and/or drugs." (*Id.* at 65; *see* Pl. Br. 8.) However, as Defendants point out, that term is not equivalent to "Usual and Customary Charge," which is used in the Outpatient Prescription Drug Rider. (*See* Def. Reply Br. 3.) Under the plain and unambiguous terms of Ackerman's plan, he was not entitled to pay the discounted rate if it was less than the copayment amount.

ERISA Plaintiff Mohr's plans for 2011 through 2013 contain similar language to Plaintiff Ackerman's plan. (*See* Dkt. No. 80 at 1043, 1077, 1089, 1123, 1136, 1170.) However, Plaintiffs argue that Mohr's plan documents indicate that Mohr was entitled to the discounted rate during those years. (*See* Pl. Br. 8-9.) For example, Plaintiffs point to a sentence under the heading of "How Covered Services are Reimbursed" in Mohr's "Member Handbook," which states: "We reimburse the Network Provider directly when you receive Covered Services and you will not be responsible for any amount billed in excess of the contracted fee for the Covered Service." (Dkt. No. 98-7 at 55; *see* Pl. Br. 9.) Because the Summary of Benefits for Mohr's 2011-13 plans lists her supplemental prescription drug coverage under the heading of "Covered Service," Plaintiffs argue that this language from the handbook applies. (*See* Pl. Br. 9.)

Except as stated in the Member Handbook, the terms of Mohr's 2011 to 2013 plans do not appear to entitle members to the discounted rate for outpatient pharmacy benefits and are structured similarly to Ackerman's plan. (*See, e.g.*, Dkt. No. 98-7 at 67-149.) The 2013 plan, for example, states that the terms and conditions of the plan are subject to changes made by rider and that the terms of a rider supersede conflicting terms in the main plan documents. (*See id.* at 97.) The Outpatient Prescription Drug Rider provides for coverage at "Network Pharmacies," and does not provide for use of the discounted rate in determining member contribution amounts, except where the Summary of Benefits provides for coinsurance as "a percentage of the Prescription Drug Cost" (in essence, the discounted rate). (*Id.* at 143, 148.) However, because the Member Handbook implies that plan members will be entitled to the discounted rate for all Covered Services, which could be interpreted to include outpatient prescription drugs, the Court will assume, without deciding, that she may be entitled to the discounted rate under the terms of her plans for 2011 to 2013.

Mohr's 2014 plan has a different structure and is ambiguous with regard to entitlement to the discounted rate. The 2014 plan states, under the heading of "Section VI—Covered Services," that for "Prescription Drugs purchased at a retail or mail order or designated Participating Pharmacy, [the plan member is] responsible for paying the lower of:" (1) "The applicable Cost-Sharing" or (2) "The Participating Pharmacy's Usual and Customary Charge." (Dkt. No. 80 at 974.) The plan defines "Cost-Sharing" as "[a]mounts [the plan member] must pay for Covered Services, expressed as Coinsurance, Copayments, and/or Deductibles." (*Id.* at 933.) Section IV, entitled "Cost-Sharing Expenses and Allowed Amount," states: "Except where stated otherwise, after [the plan member has] satisfied the annual Deductible . . . [the plan member] must pay the Copayments, or fixed amounts, in the Schedule of Benefits in Section XV . . . . However, when the Allowed Amount for a service is less than the Copayment, [the plan member is] responsible for the lesser amount." (*Id.* at 944.) Section IV defines the term "Allowed Amount" to mean "the amount we have negotiated with the Participating Provider." (*Id.* at 945.) The plan definitions section defines "Allowed Amount" as "[t]he maximum amount on which Our payment is based for Covered Services." (*Id.* at 933.)

Mohr's 2014 plan does not separate the outpatient prescription drug coverage from the main plan via a supplemental rider. Although the 2014 plan states that the Cost-Sharing Expenses are outlined in the "Schedule of Benefits in Section XV . . . when Covered Prescription Drugs are obtained from a retail or mail order or Designated pharmacy," and the Schedule of Benefits sets forth specific copayment amounts for certain drug tiers,[3] the terms of Section IV appear to entitle Mohr to the discounted rate. (*Id.* at 973-74.) For present purposes, the Court

---

[3]    The Court questions whether the Schedule of Benefits for Mohr's 2014 plan provided by Defendants is actually the correct Schedule of Benefits given that it is entitled "Section XIV," and not "Section XV," as the plan notes. (Dkt. No. 80 at 911, 974-75.)

assumes that Mohr's 2014 plan entitled her to the discounted rate if it was less than the listed copayment amounts. *See Bond*, 309 F.3d at 1067-68.

The next ERISA Plaintiffs, M. and R. Chambers, have a plan that Plaintiffs term "Design 2." Other ERISA Plaintiffs with the same or similar plan design include Hawks, Mastra, Sohmer (2015 only), and Youngs.[4] (*See* Dkt. No. 80 at 590, 756, 821, 859, 903, 1561, 2140.) These plans do not provide for outpatient prescription drug coverage within the main plan documents, but instead provide for the coverage through an "Outpatient Prescription Drug Rider." (*E.g.*, Dkt. No. 80 at 420.) The Rider directs plan members to the "Outpatient Prescription Drug Schedule of Benefits" for information about "applicable Copayments and/or Coinsurance." (*Id.* at 424.) The Schedule of Benefits states that plan members "are responsible for paying the applicable Copayment and/or Coinsurance described in the Benefit Information table." (*Id.* at 432.) Under the heading of "Payment Information," the Schedule of Benefits provides that, for prescription drugs purchased at a network retail pharmacy, plan members are responsible for paying the lower of either (1) the "applicable Copayment and/or Coinsurance", or (2) the "Network Pharmacy's Usual and Customary Charge."[5] (*Id.* at 433.) That table also directs plan members to the Benefit Information table and defines, for example, copayment as "a specific dollar amount." (*Id.*) Two pages later, the Benefit Information table states that the plan pays "100% of the Prescription Drug Charge" after the member pays a set Copayment amount (depending on the tier of the drug). (*Id.* at 436.)

---

[4]    Non-ERISA Plaintiffs Alston, Stevens, and Wiltsie's plans also have a similar "Design 2" structure. (*See, e.g.*, Dkt. No. 80 at 267, 1262, 1391.)

[5]    The plans for the Chambers, Hawks, Mastra, Sohmer (2015 only), and Youngs entitle plan members to the discounted rate for prescriptions filled through mail order network pharmacies, but not retail network pharmacies. (*See* Dkt. No. 80 at 433, 590, 756, 821, 859, 903, 1561, 2140.) However, these Plaintiffs do not allege that they filled prescriptions through mail order network pharmacies and overpaid when doing so.

Defendants argue that the Rider clearly sets forth what plan members must pay and does not entitle them to the discounted rate for drugs filled at retail network pharmacies. (*See* Def. Br. 7-9.) Plaintiffs argue the opposite. (*See* Pl. Br. 6-7.) They start by pointing to the first page of the Rider, which states: "Certain capitalized words have special meanings. We have defined these words in either the [plan definitions section] or in this Rider in Section 3: Defined Terms." (*E.g.*, Dkt. No. 80 at 420 (emphasis omitted); *see* Pl. Br. 6.) The Rider's definition section does not define "Copayment," but the plan's definition section does. There, the plan defines "Copayment" as "the charge, stated as a set dollar amount, that [a plan member is] required to pay for certain Covered Health Services." (Dkt. No. 80 at 357.) It continues: "Please note that for Covered Health Services, you are responsible for paying the lesser of the following: The applicable Copayment [or] The Eligible Expense." (*Id.*) Plaintiffs argue that this language is part of the definition of "Copayment." (*See* Pl. Br. 7.) They then point to the plan's Schedule of Benefits, which defines "Eligible Expenses," for "Covered Health Services [that] are received from a Network provider," as "our contracted fees with that provider." (Dkt. No. 80 at 397.) They contend that Eligible Expenses is imported, by way of the main-policy Copayment definition, to the Rider's articulation of member contribution responsibilities. (*See* Pl. Br. 7.)

The Court disagrees with Plaintiffs' interpretation of the plan documents. The central flaw in Plaintiffs' argument is that the "please note" language appended to the plan's definition of "Copayment" is not part of the definition of that term, but rather an additional note added to reiterate that, for services covered under the main plan, plan members must pay the lesser of the listed copayments or the "Eligible Expense." The same provision is included in the Schedule of Benefits attached to the main plan, which governs plan member contribution amounts for services covered by the main plan. (*See* Dkt. No. 80 at 369.) As the plan makes clear, though,

9

Riders are not subject to main plan terms if the Riders amend otherwise applicable terms. (*See id.* at 362-63.) The Outpatient Prescription Drug Rider plainly modifies the member contribution scheme. It amends the "lesser of" options that determine the *amount* plan members are required to pay, as a plan *term*, by replacing "Eligible Expenses" with "Usual and Customary Charge" and keeping the applicable "Copayment" as an option, using approximately the same definition of the term—a "specific," rather than "set," dollar amount. (*Compare* Dkt. No. 80 at 433, *with id.* at 357.) The plan unambiguously states what plan members must pay for outpatient prescription drugs. Therefore, ERISA Plaintiffs with "Design 2" plans (M. Chambers, R. Chambers, Hawks, Mastra, Sohmer (2015 only), and Youngs) are not entitled to the discounted rate as a "lesser of" copayment option when filling drugs at retail network pharmacies.

Defendants assert that Holm's plan does not provide coverage for outpatient prescription drugs,[6] but that his employer entered into a prescription drug benefit administration agreement directly with OptumRx. (*See* Def. Br. 9 n.10.) Nevertheless, they note that this administration agreement provides that member copayments are the lesser of (1) "Ingredient Cost + applicable dispensing fee + applicable Sales Tax, or" (2) the "[a]pplicable Copay." (Dkt. No. 71 at 57; *see* Def. Br. 10.) The "Ingredient Cost" takes into account the discounted rate. (*See* Dkt. No. 71 at 57; Pl. Br. 9.) In addition, the administration agreement states, under the heading of "Pharmacy Program Fees," that "[f]or each Covered Drug claim, member will be charged: Member's Copayment." (Dkt. No. 71 at 61.) In view of these provisions, Holm appears to have been entitled to pay an amount based on the discounted rate. The Court therefore assumes, without deciding, that Holm's plan entitled him to the discounted rate.

---

[6]    The Parties did not provide the Court with a copy of Holm's plan documents. The Court must, at the motion to dismiss phase, accept as true Plaintiffs' allegation that Holm's plan covered outpatient prescription drugs. (*See* CAC ¶ 28.)

Lastly, it is undisputed that Ellington and Sohmer's (2016 only) plans entitled them to the discounted rate. (*See* Dkt. No. 80 at 1778, 1848, 2201.)

In summary, Ellington's and Sohmer's (2016 only) plans entitled them to pay the discounted rate if the rate was less than stated copayment amounts. The Court assumes that Holm's and Mohr's plans entitled plan members to the discounted rate. The plans for all other ERISA Plaintiffs do not entitle those ERISA Plaintiffs to the discounted rate as a "lesser of" payment option when filling prescription drugs at retail network pharmacies. Because those ERISA Plaintiffs do not allege that Defendants violated the terms of their Plans other than by not allowing them to pay lesser, discounted rates, such Plaintiffs fail to state claims for benefits under ERISA § 502(a)(1)(B).[7] *See Alves v. Harvard Pilgrim Health Care Inc.*, 204 F. Supp. 2d 198, 208-09 (D. Mass. 2002), *aff'd*, 316 F.3d 290 (1st Cir. 2003).

### 2. *Exhaustion*

Defendants argue that all ERISA Plaintiffs failed to exhaust their administrative remedies, which is a prerequisite to claims for benefits. (*See* Def. Br. 17-18.) The CAC implicitly states that Plaintiffs have not exhausted administrative remedies by asserting that such remedies are inapplicable or would be futile. (*See* CAC ¶¶ 193-98.) Plaintiffs argue that the exhaustion doctrine does not apply because the ERISA Plaintiffs' claims are not for denial of benefits; they never submitted a claim that was denied. (*See* Pl. Br. 13-15.) They also argue that the administrative process is not implicated because the plans do not provide for a process unless benefits were denied. (*See id.* at 16.) Defendants reply that participants have the right and duty to invoke ERISA's claims procedures whenever participants pay more than they should have paid

---

[7]     To the extent the ERISA Plaintiffs (except Holm, Mohr, and Sohmer) assert claims solely to clarify their rights under their plans, the Court's analysis of those ERISA Plaintiffs' plan terms clarifies the questions presented by the ERISA Plaintiffs. (*See* CAC ¶ 236(a), (d).)

under their plans. (*See* Def. Reply Br. 4.) Because Plaintiffs believe they should have paid less, this requires exhaustion. (*See id.*)

ERISA does not explicitly require exhaustion of administrative or plan remedies, *see* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(b), (m), but exhaustion is required if a plan requires exhaustion of administrative remedies. *Conley v. Pitney Bowes*, 34 F.3d 714, 716-17 (8th Cir. 1994). Exhaustion need not be "required" in the sense that it is mandatory under the plan; "whether it is a denial letter or a plan document that uses permissive language to describe a review procedure, 'claimants with notice of an available review procedure should know that they must take advantage of that procedure if they wish to bring wrongful benefit denial claims to court.'" *Wert v. Liberty Life Assurance Co. of Boston, Inc.*, 447 F.3d 1060, 1066 (8th Cir. 2006). "This judicially created exhaustion requirement serves many important purposes, including 'giving claims administrators an opportunity to correct errors, promoting consistent treatment of claims, providing a non-adversarial dispute resolution process, decreasing the cost and time of claims resolution, assembling a fact record that will assist the court if judicial review is necessary, and minimizing the likelihood of frivolous lawsuits.'" *Angevine v. Anheuser-Busch Cos. Pension Plan*, 646 F.3d 1034, 1037 (8th Cir. 2011) (quoting *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770 (8th Cir. 2001)). Exhaustion is not required, however, if (1) pursuing an administrative remedy would be futile, or (2) there is no available administrative remedy. *Id.* To show futility, a plan participant must show it is certain the claim will be denied on appeal. *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1085 (8th Cir. 2009).

Because the Court dismisses Count I as to those ERISA Plaintiffs with plans that do not entitle plan members to the discounted rate, the Court only considers exhaustion for the

remaining Plaintiffs: Ellington, Holm, Mohr, and Sohmer (2016 only). The Court begins by reviewing the administrative provisions within each of these Plaintiffs' plan documents.

Ellington's plan provides: "If you wish to receive reimbursement for a prescription, you may submit a post-service claim as described in this section if: . . . you pay Coinsurance and you believe that the amount of the Coinsurance was incorrect." (*E.g.*, Dkt. No. 80 at 1788.)[8] The plan provides a comprehensive claims and appeals process. (*See id.* at 1788-99.) It also requires exhaustion by limiting the availability of legal action until after plan members exhaust or complete claims and appeals procedures. (*See id.* at 1799.) Ellington's plan plainly requires exhaustion and provides procedures for challenging coinsurance calculations.

Sohmer's 2016 plan uses similar language to Ellington's plan, but substitutes "Coinsurance" for "Copay." (*Id.* at 2176.) It also provides a comprehensive claims and appeals process and requires exhaustion by limiting the availability of legal remedies. (*See id.* at 2176-86.) Thus, Sohmer's 2016 plan plainly requires exhaustion and provides procedures for challenging copayment calculations.

Mohr's 2014 plan allows members to file claims for benefits and states: "If You disagree with Our claim determination you may submit a Grievance pursuant to Section XI—Grievance, Utilization Review & External Appeals of this Certificate." (Dkt. No. 80 at 988.) It also states that the "Grievance procedure applies to any issue not relating to a Medical Necessity or experimental or investigational determination by Us. For example, it applies to contractual benefit denials or issues or concerns You have regarding Our administrative policies." (*Id.* at 990.) It then provides for a grievance review and appeals process. (*See id.* at 990-91.) Although the plan does not appear to limit the availability of legal actions, it does designate courts located

---

[8]    Ellington's plan only requires payment of coinsurance, not copays. (*See* Dkt. No. 80 at 1778.)

in New York as the forum for legal disputes related to the plan. (*See id.* at 1016.) The plan's

administrative procedures are sufficient to advance the purposes for requiring exhaustion. *See*

*Angevine*, 646 F.3d at 1037. Pursuing these procedures will allow the plan to correct any errors

in its calculation of plan benefits and will create a fact record to assist the Court if judicial review

does indeed become necessary. *See id.* Therefore, the Court holds that Mohr's 2014 plan

required exhaustion due to the availability of grievance procedures for resolving contractual

disputes.

Mohr's 2011 through 2013 plans also require exhaustion. For example, the 2013 plan's

Member Handbook states: "Our Grievance, Appeal and Complaint Procedures provide Members

with a meaningful, dignified and confidential process to hear and resolve issues between

Members, Us and Providers in a timely manner." (Dkt. No. 80 at 1047.) The "Grievance and

Appeal procedure" is designed for "denials based on benefits exclusions or limitations and

claims payment disputes."[9] (*Id.* at 1055.) The procedure allows for appeals. (*See id.* at 1055-57.)

The plan also provides for a "Complaint Procedure" to handle "expression[s] of dissatisfaction

with any aspect of Our or a Network Provider's business operations, activities or behaviors

regardless of whether any remedial action is required." (*Id.* at 1057; *see id.* at 1057-59.) The plan

documents for years 2011 to 2013 also provide for the Grievance and Complaint Procedures.

(*See id.* at 1069-70, 1093, 1101-05, 1115-16, 1140, 1148-52, 1162-63.) In light of the apparent

applicability of these administrative remedies procedures, and the purposes behind requiring

exhaustion, the Court holds that Mohr's 2011 through 2013 plans require exhaustion.

---

[9]     Although Plaintiffs argued, at the motion hearing, that the Grievance procedure only
applies after there is an "Adverse Determination" based on medical necessity determinations, the
Grievance procedure language in the Member Handbook states, for example, that standard
Grievances may be initiated after either receipt of an Adverse Determination *or* for other issues.
(*See, e.g.*, Dkt. No. 80 at 1056.)

The administrative agreement relating to Holm's plan provides that OptumRx will adjudicate benefits claims and reimbursement requests submitted by plan members. (*See* Dkt. No. 71 at 18.) It alludes to claims and appeals procedures under the plan. (*See id.*) Plaintiffs do not argue to the contrary. (*See, e.g.*, Pl. Br. 18.) Holm's plan required exhaustion in that reimbursement procedures relating to copayment calculations are available to him. Pursuing these procedures, like those under Mohr's plans, will fulfill the purposes of the exhaustion doctrine.

Because the relevant ERISA Plaintiffs' plans provided avenues for addressing their copayment and coinsurance calculation disputes and required exhaustion of those avenues, the Court turns to futility. Plaintiffs allege that exhaustion would be futile because Defendants would be the ones who would review the claims, and Defendants have concealed their scheme and made it difficult to pursue an administrative claim. (*See* CAC ¶¶ 195-97.) Plaintiffs also argue that exhaustion would be futile because Defendants admit to the spread scheme, but deny doing anything wrong. (*See* Pl. Br. 19.) Finally, they assert that the time to file any kind of claim has expired for some Plaintiffs. (*See id.* at 21.) Defendants respond that Plaintiffs' reasons for futility would excuse exhaustion in virtually every case. (*See* Def. Br. 20-22.) They also argue that Plaintiffs became aware of the spread before initiating this action, but did not avail themselves of any administrative remedies. (*Id.* at 22.)

"The futility exception is narrow—the *plan participant* must show that it is *certain* that [her] claim will be denied on appeal, not merely that [she] doubts that an appeal will result in a different decision." *Brown*, 586 F.3d at 1085 (alterations in original) (emphasis added) (internal quotation marks omitted). "'[U]nsupported and speculative' claims of futility do not excuse a

claimant's failure to exhaust his or her administrative remedies." *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 898 (8th Cir. 2009).

It is far from certain that, had the ERISA Plaintiffs pursued available administrative processes, Defendants would have denied or failed to respond to the ERISA Plaintiffs' claims, grievances, or complaints. *See Angevine*, 646 F.3d at 1038 (rejecting futility when the plaintiff made no attempt to pursue an administrative remedy and administrator had not denied similar claims); *Chorosevic v. MetLife Choices*, 600 F.3d 934, 946 (8th Cir. 2010) (rejecting futility on basis of the defendants' positions in litigation); *Springer v. Wal-Mart Associates' Grp. Health Plan*, 908 F.2d 897, 901 (11th Cir. 1990) ("If futility were established by the mere fact that the plan administrator who makes initial benefits decisions and the trustees who review appeals share common interests or affiliations, the exhaustion of internal administrative remedies would be excused in virtually every case."). Moreover, excusing exhaustion in any case involving confidential discounted rates and the correct application of entitlement to those rates to copayment and coinsurance amounts would undermine the purposes of the exhaustion requirement in many cases.

Most of the relevant plans do not limit the time period for filing claims, grievances, or complaints. Where they appear to present a deadline, the limitation period is either a set number of days after a covered health service was provided or when the member became aware of the issue. (*See, e.g.*, Dkt. No. 80 at 988, 990, 1056, 1069.) Plaintiffs do not allege facts showing that pursuit of any of the relevant plans' administrative remedies would certainly be denied on the basis that they are untimely. Even if the relevant administrative procedures have filing deadlines, Plaintiffs have not alleged, nor can the Court automatically assume, that the plan would not review a tardy claim, grievance, or complaint. *See Weeks v. Coca-Cola Bottling Co. of Ark.*, 491

F. Supp. 1312, 1313 (E.D. Ark. 1980) ("[N]o attempt was made by the plaintiff to avail himself of [the] procedure, and he argues that the Retirement Committee would have summarily denied any retirement request outside the 90-day period. On the present state of the facts, it is impossible to say whether or not the Retirement Committee would have so acted. The equities of this situation called for the Retirement Committee to be required to allow the plaintiff to present additional evidence outside this 90-day period, and the Court should not assume that had this request been made, it would have been denied."); *see also Schleeper v. Purina Benefits Ass'n*, 170 F.3d 1157, 1158 (8th Cir. 1999) (per curiam) ("[W]e are unwilling to assume futility."). The remaining Plaintiffs therefore fail to meet their burden of showing futility of exhaustion, and their claims in Count I are dismissed for failure to exhaust administrative remedies.[10]

## B.  Count IV under ERISA § 404

Plaintiffs allege that Defendants breached their fiduciary duties with respect to the ERISA Plaintiffs and the ERISA Subclass when they, generally, (1) required pharmacies to charge a spread for prescription drugs (a benefit calculation), (2) required pharmacies to remit the spread, (3) set their own compensation by requiring the clawbacks, (4) misrepresented and failed to disclose the manner in which they charged for prescription drugs, (5) prohibited pharmacies from disclosing to patients the discounted rates or to sell at those rates, and (6) negotiated the discounted rates. (*See* CAC ¶ 153; *see also* Pl. Br. at 23-30.) Defendants argue that Count IV, as well as Counts II, III, and VI, fail because Defendants did not act as fiduciaries

---

[10]    Having decided that exhaustion by Ellington, Holm, Mohr, and Sohmer is required, the Court need not address the other arguments raised with respect to Count I. To the extent these ERISA Plaintiffs bring claims to clarify benefits, such claims fall within the exhaustion doctrine. *See Harrison v. TEAMCARE-A Cent. States Health Plan*, 187 F. Supp. 3d 812, 817 (E.D. Ky. 2016); *see also Stark v. PPM Am., Inc.*, 354 F.3d 666, 671 (7th Cir. 2004) ("Exhaustion of plan remedies is favored because . . .the facts and the administrator's interpretation of the plan may be *clarified* for the purposes of subsequent judicial review . . . ." (emphasis added) (citation omitted)).

when taking these actions, and the claims are disguised attempts to avoid exhaustion. (*See* Def. Br. 23.)

As an initial matter, "there can be no breach of fiduciary duty where an ERISA plan is implemented according to its written, nondiscretionary terms." *Alves*, 204 F. Supp. 2d at 210; *see Alves*, 316 F.3d at 291. Thus, the fiduciary duty claims brought by the ERISA Plaintiffs other than Ellington, Holm, Mohr, and Sohmer fail. They also fail for the reasons that the other ERISA Plaintiffs' claims fail, as follows.

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see Lockheed Corp. v. Spink*, 517 U.S. 882, 892 (1996). "[A] person is a fiduciary with respect to a plan to the extent," for example, "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). ERISA requires "that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225.

With respect to actions (1) and (3),[11] Defendants did not act as fiduciaries because they did not exercise discretionary authority over the plan or its assets when calculating and relaying copayment and coinsurance obligations to pharmacies. Persons who have no power to make decisions as to plan policy, interpretations, practices, or procedures, but who perform

---

[11]    Plaintiffs allege that all "Defendants" engaged in these actions, but the CAC implies only that OptumRx or Defendants who acted as administrators engaged in these actions. (*See, e.g.*, CAC ¶¶ 58-62, 153.)

administrative functions for an employee benefit plan within the framework of the plan's policies, interpretations, rules, practices, and procedures, are not fiduciaries. *See* 29 C.F.R. § 2509.75-8, D-2. Examples of these "ministerial functions" include calculation of benefits, calculation of services and compensation credits for benefits, processing of claims, and collection of contributions and application of contributions as provided in the plan. *See id.* A plan may hire a third party to perform these "ministerial claims processing functions." *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 792 (8th Cir. 2003); *see Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 832 (8th Cir. 2014); *Ince v. Aetna Health Mgmt., Inc.*, 173 F.3d 672, 675 (8th Cir. 1999) ("The processing of claims is the kind of 'purely ministerial function' that does not give rise to fiduciary duties when performed by a third party on a contract basis."). Defendants may have acted as fiduciaries when performing certain functions, but the alleged "instantaneous" calculations, based on plan terms, and relay of those calculations to pharmacies did not constitute a discretionary fiduciary action. (CAC ¶ 58.) Plaintiffs do not allege facts showing that Defendants' actions constituted anything more than ministerial claims processing.

Plaintiffs argue that Defendants acted as fiduciaries when they exercised discretion over the amounts they charged plan participants—which enabled Defendants to "set" their own compensation. (*See* Pl. Br. 25-26.) A person may become a fiduciary with respect to compensation if a plan gives the person control over factors, such as claims determinations, that determine the amount of that person's compensation, as sourced from plan assets. *See F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) (citing *Sixty-Five Sec. Plan v. Blue Cross & Blue Shield*, 583 F. Supp. 380, 387–88 (S.D.N.Y.1984)); *Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 619 (6th Cir. 2003) ("We agree with the Seventh Circuit's reasoning that where parties enter into a contract term at arm's length and where the

19

term confers on one party the unilateral right to retain funds as compensation for services rendered with respect to an ERISA plan, that party's adherence to the term does not give rise to ERISA fiduciary status unless the term authorizes the party to exercise discretion with respect to that right."). As already stated, Plaintiffs do not allege facts demonstrating that Defendants had discretion over the instantaneous calculations they were performing, except to the extent that Plaintiffs allege Defendants did not apply the correct calculations. But if calculations may be construed as an exercise of discretion solely on the basis that the calculations were incorrect under the terms of the relevant plan, any mistake could transform ministerial conduct into fiduciary act. *See Kyle Rys., Inc. v. Pac. Admin. Servs., Inc.*, 990 F.2d 513, 516 (9th Cir. 1993) (finding that an administrator's actions in administering a plan did not render it a fiduciary when it "improperly and untimely paid claims"). Based on the Court's review of the CAC and plan documents, the Court cannot reasonably infer that Defendants had discretion to require copayments or coinsurance outside of what was required by the plan documents. *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 301 (1st Cir. 2005) ("Our review of the requirements imposed on the PBMs . . . lead[s] us to believe that the PBMs do not exercise 'discretionary authority or control in the management and administration of the plan.'"); *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1989) ("An insurance company does not become an ERISA 'fiduciary' simply by performing administrative functions and claims processing within a framework of rules established by an employer . . . .").

The Defendants also did not act as fiduciaries when engaging in actions (2), (3) (in part), (5), and (6) because all of these activities involved the performance of contractual terms negotiated with plans or pharmacies. First, to the extent Plaintiffs complain about the acts of negotiating and setting discounted rates, such conduct is not a fiduciary function. Setting the

payout details of a plan, including distribution of "profit derived from the spread between subscription income and expenses of care and administration" does not risk breach of any fiduciary duties because "decisions about the content of a plan are not themselves fiduciary acts." *Pegram*, 530 U.S. at 226. Furthermore, negotiating prices with providers is also not a fiduciary function, but rather the administration of a network administrator's business. *See DeLuca v. Blue Cross Blue Shield of Mich.*, 628 F.3d 743, 747 (6th Cir. 2010); *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 475 (7th Cir. 2007); *Moeckel v. Caremark, Inc.*, 622 F. Supp. 2d 663, 677 (M.D. Tenn. 2007); *cf. McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1003 (8th Cir. 2016) ("[A] service provider's adherence to its agreement with a plan administrator does not implicate any fiduciary duty where the parties negotiated and agreed to the terms of that agreement in an arm's-length bargaining process."). "[T]he mere fact that a company has named itself as pension plan administrator or trustee does not restrict it from pursuing reasonable business behavior." *Vartanian v. Monsanto Co.*, 131 F.3d 264, 268 (1st Cir. 1997). In line with the above principles, Defendants' choice to negotiate contractual terms requiring pharmacies to keep rates confidential was also not a fiduciary function. It did not concern discretionary management or administration of any plans or plan assets. And confidentiality may serve legitimate business interests.

With respect to action (4), persons may act as fiduciaries when communicating plan terms to plan members. For example, it is a breach of the duty of loyalty to affirmatively mislead a participant or beneficiary. *Braden*, 588 F.3d at 598. However, there are no allegations showing that Defendants misrepresented or failed to disclose the terms of the ERISA Plaintiffs' member contribution responsibilities under the plans. The terms were included in the ERISA Plaintiffs' plan documents, and Plaintiffs do not plausibly allege that those terms were themselves false or

materially misleading. Where the plans do not entitle the ERISA Plaintiffs to the discounted rate as a "lesser of" option, the plans allude to the discounted rate in other parts of the plans, as already discussed. Although Defendants never informed plan members what the discounted rates were, that failure is not actionable as a breach of fiduciary duty. *See Alves*, 316 F.3d at 291; *Alves*, 204 F. Supp. 2d at 210; *Corsini v. United HealthCare Servs., Inc.*, 145 F. Supp. 2d 184, 193 (D.R.I. 2001). And Plaintiffs do not plausibly allege how failure to disclose negotiated rates or the collection of a spread for plans that entitle plan members to those rates as a "lesser of" option (or plans that do not) was material to making informed decisions about benefits. *See Braden*, 588 F.3d at 594; *Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir. 1997). Therefore, the ERISA Plaintiffs fail to make out a breach of fiduciary duty claim for action (4).

Finally, Plaintiffs generally argue that Defendants acted as fiduciaries by exercising authority or control over the management of plan assets, including any collected spreads, administration agreements, and insurance policies. (*See* Pl. Br. 26-28.) They argue that the spreads are plan assets because they were collected at plan members' expense and used to benefit Defendants. (*See id.* at 28.) And they argue that Defendants are misusing the administration agreements and insurance policies as "leverage" in negotiating discounted rates, spreads, and clawbacks with pharmacies. (*Id.*). Defendants reject these contentions. (*See* Def. Br. 23-25.)

Plan assets include cash, financial instruments, and other property that may be used to the benefit of the fiduciary at the expense of plan participants. *See Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 429 (3d Cir. 2013); *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1467 (9th Cir. 1995) (explaining the functional approach to defining plan assets). For example, participant contributions in the form of premiums are plan assets when collected. *See* 29 C.F.R. § 2510.3-102(a)(1); *Collins v. Pension & Ins. Comm. of S. Cal. Rock Prods. & Ready Mixed Concrete*

*Ass'ns*, 144 F.3d 1279, 1282 (9th Cir. 1998) ("Although ERISA does not explicitly define 'plan assets,' a plain interpretation of the term does not encompass future contributions not yet made."). When determining whether something is a plan asset, courts rely on ordinary notions of property rights. *See Edmonson*, 725 F.3d at 429. If a plan does not have a right to certain property, then the property is not a plan asset such that fiduciary duties apply to the disposition of that property. *See Chicago Dist. Council of Carpenters Welfare Fund*, 474 F.3d at 476 (finding that a third-party administrator owed no fiduciary duties to a plan for rebates when the administrator was under no obligation to secure manufacturer rebates on prescription drugs and was only obligated to forward a fixed amount of any rebates to the plan). As such, because plans generally have no right to the recoupment of copayments and coinsurance paid to providers, such payments do not, absent an arrangement to the contrary, constitute *plan* assets, but instead merely the out-of-pocket expenses of plan members. *See Deluca v. Michigan*, No. 06-12552, 2007 WL 1500331, at *3 (E.D. Mich. May 23, 2007).

Plaintiffs do not plausibly allege that the spreads collected on copayments are plan assets. Plaintiffs allege that such payments come from plan members, not the plan, and they do not allege facts showing that the spreads are collected on behalf of the plan or that the plan has a right to the spreads. (*See* CAC ¶ 72.) Rather, they appear to allege that the spreads were pure profit for Defendant administrators. (*See* CAC ¶¶ 12, 79, 153(f), 180(m), 186, 198.) Plaintiffs argue that the spreads fit the functional definition of plan assets, but their reliance on that definition is misplaced; as one court has observed, the functional approach does not generally apply to situations involving financial assets. *See Edmonson*, 725 F.3d at 429.

In addition, Plaintiffs do not plausibly allege how Defendants exercised authority or control over any agreements. As already determined, to the extent Defendants negotiated lower

discounted rates, such activities were not fiduciary functions. That Defendants were able to

leverage the size of their member base, garnered as a result of doing business with multiple plans

and administrators, to negotiate lower rates with pharmacies does not constitute exercise of or

control over administration agreements or insurance policies. *See Moeckel v. Caremark, Inc.*,

622 F. Supp. 2d 663, 679 (M.D. Tenn. 2007) ("There is no requirement in the contract that [the

third-party administrator] negotiate retail pharmacy discounts for the benefit of or behalf of the

. . . Plan."). Even under the functional approach, Plaintiffs have not plausibly alleged how that

leveraging benefited Defendants *at the expense* of insureds or the plan. Therefore, Plaintiffs do

not plausibly allege that Defendants acted as fiduciaries vis-à-vis any plan assets.

    In summary, Defendants did not act as fiduciaries when engaging in the complained-of

conduct or, if they did, Plaintiffs have not plausibly alleged how such conduct constitutes a

breach of any fiduciary duties. Therefore, Count IV is dismissed.[12]

## C.  Counts II and III under ERISA §§ 406(a)(1)(C)-(D) and 406(b)

    The ERISA Plaintiffs bring claims, on behalf of themselves and the ERISA Subclass, for

prohibited transactions in Counts II and III. (*See* CAC ¶¶ 251, 238-39.) Plaintiffs argue that

Defendants' clawbacks constituted compensation, siphoned from plan assets. (*See* Pl. Br. 38-39.)

They also argue that Defendants used plan administrative agreements and insurance policies to

secure clawbacks. (*See id.* at 41.)

    To state a claim under ERISA's prohibited transaction rules in § 406, plaintiffs must have

acted as fiduciaries with respect to the complained-of conduct. *See Lockheed*, 517 U.S. at 892;

---

[12]    In addition, Plaintiffs' breach of fiduciary duty claims may be subject to the exhaustion doctrine to the extent they "turn[] on an interpretation of the ERISA benefits plan at issue." *Burds v. Union Pac. Corp.*, 223 F.3d 814, 817 (8th Cir. 2000) (citing *Zipf v. Am. Tel. & Tel. Co.*, 799 F.2d 889, 894 n.6 (3d Cir. 1986)); *see Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 254 (3d Cir. 2002).

*Pegram*, 530 U.S. at 226; *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2001)

("[P]rohibited transaction rules apply only to decisions by [a person] acting in its fiduciary

capacity."). Prohibited transactions also generally involve plan assets. *See* 29 U.S.C. § 1106(a)-

(b).

Plaintiffs' prohibited transaction claims fail for the same reasons that their fiduciary duty

claims fail. *See supra* Part III.B. Plaintiffs do not plausibly allege that Defendants acted as

fiduciaries when making the complained-of actions with respect to any transactions. They also

do not plausibly allege use of plan assets "that are potentially harmful to the plan." *Lockheed*,

517 U.S. at 893; *see Alves*, 204 F. Supp. 2d at 215 ("The mere fact that defendants used

discounting arrangements to reduce their net cost of providing prescription drug benefits does

not constitute self-dealing . . . ."). Therefore, the prohibited transaction claims are dismissed.

**D.  Counts VI and VII under ERISA §§ 405(a) and 502(a)(3)**

The ERISA Plaintiffs bring claims, on behalf of themselves and the ERISA Subclass, for

underlying breaches of fiduciary duty and prohibited transactions in Counts VI and VII. (*See*

CAC ¶¶ 281, 289.) Because both Counts VI and VII rely on underlying breaches of fiduciary

duty or prohibited transactions, and the Court dismisses the underlying fiduciary duty and

prohibited transaction claims, these Counts are also dismissed. *See In re Citigroup ERISA Litig.*,

662 F.3d 128, 145 (2d Cir. 2011), *abrogated on other grounds by Fifth Third Bancorp v.

Dudenhoeffer*, 134 S. Ct. 2459 (2014).

**E.  Count V under ERISA § 702**

The ERISA Plaintiffs bring, on behalf of themselves and the ERISA Subclass, claims for

discrimination on the basis of medical condition in Count V. (*See* CAC ¶ 274.) Defendants argue

that Count V fails because Defendants required the ERISA Plaintiffs to pay the same member

contribution as every other plan member, per the term of the ERISA Plaintiffs' plans. (*See* Def. Br. 30; Def. Reply Br. 13.) Plaintiffs argue that the ERISA Plaintiffs purchased prescription medications subject to the spread, whereas plan members who did not need the specific drugs that lead to spreads did not pay a spread, so Defendants discriminated against the ERISA Plaintiffs with respect to these Plaintiffs' contributions as a condition of continued enrollment. (*See* Pl. Br. 42.)

ERISA § 702 provides that a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." 29 U.S.C. § 1182(b)(1). Generally speaking, discrimination does not occur if plan terms apply uniformly to similarly situated plan members. *See* 29 C.F.R. § 2590.702; *see Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1238–39 (11th Cir. 2010). Because Plaintiffs do not allege facts showing that any of the relevant plans' terms did not apply uniformly to plan members, Count V is dismissed.

**F.  Counts VIII and IX under RICO**

All Plaintiffs bring, on behalf of themselves and all Classes and Subclasses, claims under RICO in Counts VIII and IX. (*See* CAC ¶¶ 294, 327.) RICO prohibits "any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011)

(quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)). To establish a civil claim under RICO, plaintiffs must show that the defendants engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009) (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

Defendants argue that Plaintiffs fail to adequately plead the elements of RICO. (*See* Def. Br. 31.) In particular, they attack Plaintiffs' allegations relating to the enterprise. (*See id.* at 33-36.) Plaintiffs allege two alternative enterprises for Count VIII: (1) "OptumRx and the pharmacies in Optum's pharmacy network," or (2) "solely . . . such pharmacies." (CAC ¶ 295.) Defendants argue that Plaintiffs' allegations show that Defendants and pharmacies in the OptumRx network have an adversarial relationship, did not have a common purpose to defraud, did not work together to defraud plan members, and merely engaged in parallel conduct. (*See* Def. Br. 31, 33-36; Def. Reply Br. 15-17.) Plaintiffs assert that the pleaded enterprise shares the common purpose of providing Plaintiffs and class members with medically necessary prescription drugs in accordance with the terms of their plans and that the pharmacies knew about the pharmacy network's collective existence. (*See id.* at 44-50.)

An enterprise, for RICO purposes, "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see Nelson v. Nelson*, 833 F.3d 965, 968 (8th Cir. 2016). An association-in-fact enterprise must be "a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). An association-in-fact enterprise has at least three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

Generally speaking, a "hub-and-spokes" enterprise, in which the hub serves as a contact point for other members who otherwise do not interact, is not sufficiently coherent unless the members spokes are connected by a unifying rim. *See Target Corp. v. LCH Pavement Consultants, LLC*, No. 12-CV-1912 (JNE/JJK), 2013 WL 2470148, at *4 (D. Minn. June 7, 2013) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010) and other cases). "This is because without a 'rim,' there are no allegations of concerted actions among the spokes, only allegations of parallel conduct. And an association-in-fact enterprise requires more than parallel conduct; it requires relationships among those associated with the enterprise, and it requires those associated with the enterprise to 'function as a unit, that they be "put together to form a whole."'" *Id.* (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 374).

Plaintiffs failed to allege a RICO enterprise. OptumRx serves as the hub for pharmacies in its network. (*See* CAC ¶ 295.) The pharmacies are the spokes. (*See id.*) But the CAC contains no allegations demonstrating any concerted actions among the spokes. It only alleges parallel collection of spreads through adherence to pharmacy-by-pharmacy network contracts and general network policies. (*See id.* ¶¶ 63-64, 294-310.) The pleaded structure lacks "relationships among those associated with the enterprise" showing that they "associated *together* for a common purpose." *Boyle*, 556 U.S. at 944, 946 (emphasis added). This is demonstrated by the inferential notion that, absent OptumRx's efforts to develop its network of pharmacies, there would be no basis upon which to conclude that the pharmacies now in the network are part of an enterprise; there are no allegations showing that the pharmacies have relationships between themselves in addition to their individual contractual relationships with OptumRx. *See In re Ins.*

28

*Brokerage*, 618 F.3d at 374; *LCH Pavement*, 2013 WL 2470148, at *5. Because Plaintiffs fail to plead an adequate RICO enterprise for Count VIII, the Count is dismissed.[13]

Defendants argue that because Plaintiffs fail to plead a RICO claim in Count VIII, the RICO conspiracy claim in Count IX also fails. (*See* Def. Br. 38.) "Although the Eighth Circuit has not directly addressed this issue, other courts have determined that '[a]ny claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.'" *Jaworski v. Rollupspacovers, Roll-it Spa Covers, Creative Innovations LLC*, No. 11-CV-1816 (DSD/JSM), 2012 WL 1130684, at *3 (D. Minn. Apr. 3, 2012) (quoting *Lum v. Bank of Am.,* 361 F.3d 217, 227 n.5 (3d Cir. 1993), *abrogated on other grounds by Twombly*, 550 U.S. 544) (citing *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000), and *Nat'l Org. for Women, Inc., v. Scheidler*, 968 F.2d 612, 630 (7th Cir. 1992)). The Court agrees. Count IX is dismissed.

## G. Counts X-XVIII under State Law

### 1. *Counts X-XII under Minnesota Common Law*

The Non-ERISA Plaintiffs (Alston, Fellgren, Stevens, and Wiltsie), on behalf of themselves and the Non-ERISA Subclass, bring claims for breach of contract (Count X), breach of the covenant of good faith and fair dealing (Count XI), and unjust enrichment (Count XII). (*See* CAC ¶¶ 336, 345, 349-50.) As previously stated, Alston, Stevens, and Wiltsie have plans that do not entitle them to the discounted rate. *See supra* note 4. Therefore, the Court dismisses Counts X-XII with respect to these Plaintiffs. Fellgren's claims remain because her plan entitled her to the discounted rate at retail network pharmacies. (*See* Dkt. No. 80 at 1992.)

---

[13]    The Court also determines that, for Plaintiffs without plans entitling them to the discounted rate as a "lesser of" option, Plaintiffs fail to allege the existence of fraud. Plaintiffs do not plausibly allege a material misrepresentation or omission with respect to such Plaintiffs.

Defendants argue that Fellgren's claims should be dismissed for failure to exhaust administrative remedies provided under her plan because the Affordable Care Act ("ACA") subjects non-ERISA policies to the administrative procedures under ERISA. (*See* Def. Br. 18-19.) Plaintiffs respond that no court has imposed exhaustion requirements on ACA plans and that, for that reason, the Court should not do so in this case. (*See* Pl. Br. 18.)

The ACA requires that plans provide an appeals process for coverage determinations and claims similar to that required under ERISA. *See* 42 U.S.C. § 300gg-19(a); 29 C.F.R. § 2590.715-2719(b). The ACA also incorporates ERISA's claims procedures for group health plans and health insurers offering group coverage.[14] *See* § 300gg-19(a)(2)(A) (incorporating 29 C.F.R. § 2560.503-1). Although the ACA may not contain a cause of action for benefits similar to that provided for under ERISA, *see, e.g.*, 42 U.S.C. § 300gg-22, the importation of ERISA claims and appeals procedures suggests that the purposes of exhaustion in the ERISA context would fulfill the same ends in the non-ERISA context. Moreover, the Eighth Circuit has "required exhaustion in ERISA cases only when it was required by the particular plan involved." *Conley v. Pitney Bowes*, 34 F.3d 714, 716 (8th Cir. 1994). Exhaustion of remedies provided for in non-ERISA plans is warranted when it would fulfill the purposes of ERISA exhaustion.

Fellgren's plan provides: "If you wish to receive reimbursement for a prescription, you may submit a post-service claim as described in this section if: . . . you pay a Copay and you believe the amount of the Copay was incorrect." (Dkt. No. 80 at 1944.) The plan provides a comprehensive appeals process. (*See id.* at 1946-53.) It also states: "You cannot bring any legal action against [the plan] or the Claims Administrator to recover reimbursement until 90 days

---

[14]    Fellgren's plan through her school district employer appears to be a group health plan. (*See* Dkt. No. 80 at 1872.) Defendants argue it is and that the ACA governs her plan. (*See* Def. Br. 18-19, 19 n.19.) Plaintiffs argue that "some [of Plaintiffs'] plans are subject to neither the ACA nor ERISA," but they do not explain why or single out any plans. (Pl. Br. 18.)

after you have properly submitted a request for reimbursement as described in this section and all required reviews of your claim have been completed." (*Id.* at 1953.) Requiring Fellgren to comply with her plans' procedures not only respects freedom of contract, but will also serve important purposes, such as giving administrators an opportunity to correct errors,[15] promoting consistent treatment of claims, providing a non-adversarial dispute resolution process, decreasing the cost and time of claims resolution, and assembling a fact record that will assist the Court if judicial review becomes necessary. *See Angevine*, 646 F.3d at 1037. Requiring exhaustion may also minimize the likelihood of frivolous lawsuits brought under non-ERISA, ACA plans. *See id.* Therefore, because Fellgren's plan requires exhaustion of administrative remedies, exhaustion of those remedies will promote important purposes, and Fellgren does not otherwise carry her burden of showing that exhaustion would be futile, the Court holds that Fellgren must exhaust her remedies under her plan. Accordingly, Count X is dismissed. Counts XI and XII, which arise from the same facts as Count X, are also dismissed for failure to exhaust.[16]

### 2. *Counts XIII and XIV under Michigan law*

In Count XIII, Plaintiff Wiltsie, on behalf of himself and the Non-ERISA Michigan Subclass, brings a Michigan Consumer Protection Act ("CPA"), *see* Mich. Comp. Laws § 445.903(1), claim for deceptive methods, acts, or practices in the conduct of trade or commerce, (*see* CAC ¶ 353). Although it is unclear what theory of deception Wiltsie alleges, the claim

---

[15]    Fellgren only alleges details concerning one instance of overpayment. (*See* CAC ¶ 318(xcix).)

[16]    The claims also fail because they arise from the same facts as the breach of contract claim, and the plan documents govern the dispute. *See Teng Moua v. Jani-King of Minn., Inc.*, 810 F. Supp. 2d 882, 893-94, 900 (D. Minn. 2011); *see also Angevine*, 646 F.3d at 1038 ("[W]e conclude that [the plaintiff] is required to exhaust his administrative remedies under the Plan before he can bring a civil action in federal court."); *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1144 (9th Cir. 2010) ("[C]laimants cannot circumvent the 405(h) exhaustion requirement by restyling the remedy sought.").

sounds in fraud. When a Michigan CPA claim is based on fraud or mistake, it must be pled with particularity under Rule 9(b). *See Home Owners Ins. Co. v. ADT LLC*, 109 F. Supp. 3d 1000, 1008 (E.D. Mich. 2015). Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Wiltsie's plan does not entitle him to the discounted rate as a "lesser of" option, so his claim under the Michigan CPA is implausible. *See supra* note 4. In addition, the CAC does not contain allegations that meet Rule 9(b)'s pleading standard with respect to this claim. For example, Plaintiffs allege that Wiltsie filled prescriptions on several dates, (*see* CAC ¶ 141), but they do not allege what Wiltsie paid on any date or the discounted rate for the relevant drug— both of which are needed to determine if there was a spread. In other words, the CAC does not contain allegations detailing "what was obtained or given up" as a result of any fraud. *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001). Due to these pleading inadequacies, Count XIII is dismissed.

Defendants moved to dismiss Count XIV, Wiltsie's claim under Chapter 20 of Michigan's Insurance Code, arguing there is no private right of action under the statute. In response, Wiltsie "voluntarily dismissed" Count XIV. The Court dismisses the claim.

    3.  *Count XV under the Florida DUTPA*

Fellgren, on behalf of herself and the Non-ERISA Florida Subclass, brings a Florida Deceptive and Unfair Trade Practices Act ("DUTPA"), *see* Fla. Stat. § 501.204, claim for unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, (*see* CAC ¶ 363). Defendants argue that this claim must be dismissed because the Florida DUTPA does not apply to conduct regulated by the insurance commissioner of Florida. (*See* Def. Br. 40-41; Def. Reply Br. 19.) Plaintiffs argue that

the Florida Office of Insurance Regulation ("FLOIR") does not regulate Defendants because

Defendants only provide claims administration services, not insurance, to Fellgren's plan. (*See*

Pl. Br. 58-59.)

The Florida DUTPA does not apply to "[a]ny person or activity regulated under laws

administered by: (a) [FLOIR]." Fla. Stat. § 501.212(4). FLOIR performs "the duties and

responsibilities required by the Insurance Code (Chapters 624-632, 634-642, and 651, Florida

Statutes) and Chapters 69N and 69O, Florida Administrative Code." *Statement of Agency*

*Organization and Operation*, FLOIR, http://www.floir.com/Office/AgencyOrganization

Operation.aspx (last visited Dec. 19, 2017). The Florida DUTPA does not apply to claims against

insurers. *Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1226 (S.D. Fla. 2010); *W.S.*

*Badcock Corp. v. Myers*, 696 So. 2d 776, 782 (Fla. Dist. Ct. App. 1996).

The Florida Insurance Code contains several provisions relating to third-party

administrators.[17] For example, one provision requires administrators to apply for and receive a

"valid certificate of authority issued by [FLOIR]" before operating as an administrator. Fla. Stat.

§ 626.8805(1). OptumRx has complied with this requirement and is registered to operate as an

administrator in Florida.[18] Other United entities are also registered in multiple capacities.[19] In

addition, the Code regulates administrator contractual relationships. *See, e.g.*, Fla. Stat. ch. 626,

---

[17]      The Florida Insurance Code defines an "Administrator" as "any person who directly or
indirectly solicits or effects coverage of, collects charges or premiums from, or adjusts or settles
claims on residents of this state in connection with authorized commercial self-insurance funds
or with insured or self-insured programs which provide life or health insurance coverage or
coverage of any other expenses described in s. 624.33(1) or any person who, through a health
care risk contract as defined in s. 641.234 with an insurer or health maintenance organization,
provides billing and collection services to health insurers and health maintenance organizations
on behalf of health care providers." Fla. Stat. § 626.88(1). Based on Plaintiffs' allegations,
OptumRx appears to fall within this definition.
[18]      *See Active Company Search*, FLOIR, http://www.floir.com/companysearch/ (last visited
Dec. 19, 2017) (search for "OptumRx" under "Company Name").
[19]      *See supra* note 18 (search for "UnitedHealth" under "Company Name").

Pt. VII, §§ 627.64731, 624.4411; *Self-Ins. Inst. of Am. v. Gallagher*, No. TCA 86-7308-WS, 1989 WL 143288, at *13 (N.D. Fla. June 2, 1989), *aff'd sub nom. Self-Ins. Inst. v. Gallagher*, 909 F.2d 1491 (11th Cir. 1990) (unpublished table decision). The Code also regulates activities related to this case, such as claims administration and review and the method by which claims are paid. *See, e.g.*, Fla. Stat. §§ 627.426, .613, .6131, .4035(3).

In light of the comprehensive nature of the Florida Insurance Code and its applicability to Defendants, either as administrators or insurers, and their relevant activities, the Court holds that Fellgren's Florida DUTPA claim in Count XV fails as a matter of law. Count XV is therefore dismissed.

### 4. *Count XVI under the Minnesota UDTPA*

The Non-ERISA Plaintiffs, on behalf of themselves and the Non-ERISA Subclass, bring a Minnesota Uniform Deceptive Trade Practices Act ("UDTPA"), *see* Minn. Stat. § 325D.45, subd. 1, claim for deceptive trade practices relating to the failure to disclose discounted rates and collection of spreads and misrepresenting the true amount of plan members' copayment and coinsurance obligations, (*see* CAC ¶¶ 381-83.)

To the extent the Non-ERISA Plaintiffs' Minnesota UDTPA claims relate to disclosure of negotiated rates, for reasons similar to those already stated herein, the claim is dismissed. Plaintiffs do not articulate a plausible theory as to why non-disclosure of discounted rates or the existence of a spread, as a general matter, is required by any duties or is material to Plaintiffs' benefits decisions. The Court dismisses the Non-ERISA Plaintiffs' Minnesota UDTPA claims to the extent they are based on a theory of fraudulent omissions.

Furthermore, as already stated, the only Non-ERISA Plaintiff whose plan entitled plan members to the discounted rate is Fellgren. The Court therefore dismisses the other Non-ERISA

34

Plaintiffs' claims in Count XVI for failure to plausibly plead a deceptive trade practice relating to erroneous contribution calculations. Regarding Fellgren, as discussed in Part III.G.1, her plan provides for administrative remedies in the event she believes she paid more than she should have under the plan documents. Fellgren alleges only one instance in which she paid more than she should have. (*See* CAC ¶ 318(xcix).) Requiring Fellgren to pursue her administrative remedies before asserting a claim for deceptive trade practices will promote the purposes of exhaustion. *See Burds v. Union Pac. Corp.*, 223 F.3d 814, 817 (8th Cir. 2000) (requiring exhaustion when a claim "turn[ed] on an interpretation of the ERISA benefits plan at issue"); *see also Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 254 (3d Cir. 2002) (requiring exhaustion when the plaintiff's "claim was actually premised on the plan administrators' failure to furnish plaintiff with insurance coverage"). In particular, the creation of a factual record in response to the claim will assist future judicial review, if necessary, by better enabling the Court to determine whether Fellgren is "likely to be damaged" by future actions—a requirement for seeking relief under the Minnesota UDTPA. Minn. Stat. § 325D.45, subd. 1. Therefore, Fellgren's Minnesota UDTPA claim in Count XVI relating to her alleged overpayment is dismissed for failure to exhaust.

### 5. *Count XVII under the Florida DUTPA and Count XVIII for Common Law Fraud*

Plaintiff Rabbiner, on behalf of himself and the Florida Subclass of the Medicare Class, brings a claim under the Florida DUTPA against the Optum Defendants only. (*See* CAC ¶ 394.) As already stated, however, such a claim fails as a matter of law. *See* Part III.G.3. Rabbiner also brings, on behalf of himself and the Medicare Class, a claim for common law fraud. (*See* CAC ¶ 406.) However, that claim must fail because either it challenges omissions relating to failure to disclose discounted claims—which theory the Court has already determined is not plausibly pled

and determines is also not plausibly pled with respect to Rabbiner's claims for the same reasons[20]—or because Plaintiffs do not allege the details of any instance in which Rabbiner paid more than what was required under his Medicare plan. He therefore fails to meet Rule 9(b)'s pleading standard. The claims in Counts XVII and XVIII are dismissed.

## IV. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' motion to dismiss [Dkt. No. 67] is GRANTED, as set forth in this Order.

2. Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XVI, and XVIII of the Consolidated Class Action Complaint [Dkt. No. 52] are DISMISSED WITHOUT PREJUDICE.

3. Count XIV, XV, and XVII of the Consolidated Class Action Complaint [Dkt. No. 52] are DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: December 19, 2017

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

---

[20]    Rabbiner's omissions claims may also be preempted by Medicare. *See* 42 C.F.R. § 423.440(a). Because the Centers for Medicare and Medicaid Services ("CMS") reviews and approves plan documents and marketing materials, state laws that would deem such materials misleading—when CMS has not and otherwise approved them—could conflict with federal standards and be preempted. *See Do Sung Uhm*, 620 F.3d at 1152-53, 1157.